Not for Publication

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

JUDITH MOUSTAFA,

    *Plaintiff*,

v.

RELIASTAR LIFE INSURANCE COMPANY,

    *Defendant*.

Civil Action No. 15-2531

**OPINION**

**John Michael Vazquez, U.S.D.J.**

    **THIS MATTER** comes before the Court by way of the Motion for Summary Judgment filed by Plaintiff Judith Moustafa and the Cross-Motion for Summary Judgment filed by Defendant ReliaStar Life Insurance Company ("ReliaStar"). D.E. 28, 30. The Court reviewed all submissions made in support and in opposition to the motions (D.E. 28, 30, 31-33), and considered the motions without oral argument pursuant to L. Civ. R. 78.1(b). For the reasons stated below, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED**.

**I.    FACTUAL AND PROCEDURAL BACKGROUND**

    This matter involves the denial of Plaintiff's long-term disability benefits. Moustafa was employed by Toys "R" Us, Inc. as a bookkeeping clerk from 1997 to 2009. RS000456.[1] As a

---

[1] The Court will refer directly to the administrative record (marked as RS000001 through RS000505), which was attached as Exhibit A to the Declaration of Amy M. Handler in Support of ReliaStar's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment. D.E. 30.

1

Toys "R" Us employee, Moustafa was a participant in the Toys "R" Us disability welfare plan (the "Plan"). RS000484. At all relevant times, the Plan constituted an "employee welfare benefit plan" that is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), as defined by 29 U.S.C. § 1002(1). It is sponsored by Toys "R" Us and "funded by a group insurance policy issued by ReliaStar . . . to Toys "R" Us." Answer ¶ 6. The Plan grants ReliaStar, as plan administrator, "final discretionary authority to determine all questions of eligibility and status and to interpret and construe the terms of th[e] polic(ies) of insurance." RS000501. ReliaStar is also the claims fiduciary for the Plan. RS000502.

Moustafa stopped working at Toys "R" Us on May 26, 2009 because of severe vision problems that were caused by proliferative diabetic retinopathy. RS000456. The same day, Moustafa had vitrectomy surgery on her right eye. Despite the surgery, Moustafa suffers from total blindness in her right eye. RS000101-102. Moustafa underwent vitrectomy surgery on her left eye on November 27, 2009. Moustafa still has vision in her left eye, but has a limited visual field and no depth perception. RS000053; 240-41. Because of her limited vision, Moustafa allegedly suffers from severe eye fatigue, light sensitivity, headaches, and dizziness. Moustafa also contends that because of her limited vision she walks slowly and frequently bumps into things. RS000248-50.

When Moustafa stopped working, Toys "R" Us submitted her claim for long-term disability benefits to ReliaStar. RS000035-37. Pursuant to the terms of the Plan, ReliaStar determines when a Plan beneficiary is disabled and therefore eligible for benefits. A person is "disabled" under the Plan when accidental injury or sickness changes her functional capacity to work and causes the following:

- **Regular Occupation Provision**: "During the benefit waiting period and the following 36 months, your inability to perform the *essential duties of your regular*

2

> *occupation*, and as a result you are unable to earn more than 80% of your indexed basic monthly earnings." RS000494 (emphasis added);
>
> - **Any Gainful Occupation Provision:** "After 36 months of benefits, your inability to perform the *essential duties of any gainful occupation*, and as a result you are unable to earn more than 80% of your indexed basic monthly earning."

*Id.* (emphasis added).

ReliaStar initially determined that Moustafa was disabled under the first, or "regular occupation," provision. Her disability benefits claim was approved on January 14, 2010 and was effective as of November 24, 2009. RS000035-37. As noted, this provision applied for thirty-six months.

On November 6, 2012, ReliaStar's claims administrator, Disability RMS, sent Moustafa a letter reminding her that the Plan's definition of disability changed after thirty-six months to "any gainful occupation," and that this change would go into effect for her on November 24, 2012. The letter also informed Moustafa that Disability RMS was beginning to review her benefits claim under this new definition and requested supplemental information. RS000458-59. As a result, Dr. Cangemi, a neuro-ophthalmologist and Moustafa's treating physician, completed an "Attending Physician Statement" form (the "APS form"). On the APS form, Dr. Cangemi indicated that (1) Moustafa's progress remained unchanged, there was no current treatment plan and no prescribed medications; (2) he did not expect any significant improvement in the future; and (3) her physical impairment was "Class 1" or "no limitation of functional capacity, capable of heavy work no restrictions." RS000450-51. Dr. Cangemi also noted that Moustafa is "totally blind in the right eye." *Id.*

On a diabetes education form that Moustafa completed on December 11, 2012, Moustafa indicated that she exercised at a gym three times a week for forty to forty-five minutes, used a computer for emails "to look up health and other information," and checked the "neutral" box next

3

to the statement "my diabetes interferes with other aspects of my life." RS000410-15. While in the administrative record, there is no indication that ReliaStar used this information when it decided to terminate Moustafa's benefits. ReliaStar's internal notes, which are contained in the administrative record, appear to emphasize Dr. Congemi's initial assessment of Moustafa's functional capability and the vocational analysis. *See, e.g.*, RS000340; 47.

On May 23, 2013, ReliaStar sent a letter to Dr. Cangemi requesting that he provide additional information "to better understand the extent and severity of [Moustafa's] condition." RS000326-27. In the letter, ReliaStar noted that the APS form indicated that Moustafa had no physical impairments, no limitation of functional capacity and was capable of heavy work. *Id.* After defining light and sedentary work, ReliaStar asked Dr. Cangemi if Moustafa could work full-time in sedentary to light work. Dr. Cangemi wrote in response, "yes[,] light work." *Id.* Dr. Cangemi did not respond to the question that asked him to identify Moustafa's current physical restrictions or limitations that would prevent her from returning to a light or sedentary duty occupation. *Id.*

ReliaStar also obtained a vocational analysis and labor market survey, dated April 9, 2013, from R.E.M. Vocational Services. RS000342-46. Based upon the medical documentation in Moustafa's file, which included the APS form, the analyst utilized "light" and "sedentary" work capacities for the survey. The analyst identified fifteen occupations that Moustafa could perform, taking into account her education, work history, and medical records. With one exception, the identified occupations would pay Moustafa "gainful wages," as defined by the Plan. *Id.*

On June 10, 2013, ReliaStar terminated Moustafa's long-term disability benefits because she did not meet the "any gainful occupation" definition. RS000316-20. ReliaStar indicated that in addition to a medical consultant review of Moustafa's medical records, it considered the APS

4

form, Dr. Cangemi's supplemental letter response, and the vocational analysis to make its determination. *Id.* ReliaStar concluded that Moustafa did not have any restrictions or limitations that would prevent her from performing a light or sedentary occupation. ReliaStar noted that Moustafa could return to her occupation because it is classified as sedentary, and listed the fourteen alternative occupations that paid gainful wages, which were identified in the vocational analysis. *Id.*

On October 30, 2013, Moustafa appealed ReliaStar's decision to terminate her disability benefits. RS00309. Moustafa claimed that she was "medically, physically, and vocationally disabled from returning to any type of gainful employment." RS000235. Moustafa's appeal included two letters from Dr. Cangemi, a personal statement, a vocational report from Dr. Gumerman, and medical office notes from Dr. Savoy, her optometrist. RS000235-60. In his letters, Dr. Cangemi stated that Moustafa could not return to full-time employment. RS000240-42. He wrote that Moustafa suffers from eye fatigue, would be sensitive to light, and has a limited visual field in her seeing eye. Dr. Cangemi wrote that Moustafa was "markedly limited because of her severe loss of sight" and it was difficult for her to perform simple tasks such as going up and down stairs or pouring a glass of water. *Id.* Dr. Cangemi believed that "[s]he is at significant risk at all times that something could happen to her seeing left eye." *Id.* In addition, Dr. Cangemi explained that he thought he was answering a question about Moustafa's ability to lift weights when he answered "yes[,] light weight" in his supplemental letter response to ReliaStar, not whether Moustafa could return to work. *Id.*

In her personal statement, Moustafa stated that she "has to be careful when walking," so she walks slowly and frequently bumps into things because she has to look down. RS000248-50. Moustafa also stated that she gets headaches and becomes dizzy because her left eye is strained.

*Id.* Dr. Gumerman determined that Moustafa "does not have the capacity to manage a regular full-time work schedule given the eye fatigue, limitations with vision in general and her concurrent musculoskeletal problems."[2] RS000252-60. Finally, Dr. Savoy's February 7, 2014 examination record did not address Moustafa's ability to work. RS000244-46. The record, however, indicated that at that time Moustafa had no complaints of "reported physical ocular symptoms." *Id.* She was not experiencing headaches, double vision, light flashes, floaters, or uncomfortable vision. *Id.* Finally, the record notes that Moustafa has "moderate non[-]proliferative diabetic retinopathy" and cataracts, but that her "condition is stable." *Id.*

After receiving Moustafa's appeal, ReliaStar's outside vendor, University Disability Consortium, retained a board-certified ophthalmologist, Dr. Michaelson, to conduct an independent medical record review. Dr. Michaelson reviewed Moustafa's medical records, spoke with Dr. Cangemi on April 2, 2014, and sent him a follow-up letter confirming the substance of their conversation. RS000225-26. During their conversation, Dr. Michaelson asked Dr. Cangemi why he concluded that Moustafa could not work in his recent letters when he previously stated that she could perform light work. Dr. Cangemi replied that Dr. Savoy's February 7, 2014 examination record indicated that Moustafa had various problems with her eye, including that she was developing a cataract. Dr. Cangemi stated that this information "combined with her loss of depth perception/stereopsis and field loss of vision meant that she could not work full-time." *Id.* Dr. Michaelson's letter to Dr. Cangemi (1) summarized their conversation; (2) stated Dr. Michaelson's opinion that Moustafa could return to work with specific restrictions; and (3) permitted Dr.

---

[2] Before writing his report, Dr. Gumerman interviewed Moustafa and read Moustafa's personal statement and Dr. Cangemi's two letters. RS000252.

6

Cangemi provide a written response to Dr. Michaelson's conclusion that Moustafa could return to work. *Id.* It does not appear that Dr. Cangemi responded to the letter.

Dr. Michaelson's report concluded that Moustafa could return to work, subject to the following conditions: (1) she was restricted from performing any tasks that require depth perception/stereopsis, using machine tools, or working in a hazardous environment; (2) she should not be exposed to obstacles in her working environment, dust, or particles in the air; and (3) she was restricted from driving.[3] RS000216-224. In his report, Dr. Michaelson noted the inconsistent information provided by Dr. Cangemi. First, Dr. Cangemi changed his opinion regarding Moustafa's ability to work. In addition, although Dr. Cangemi previously indicated that Moustafa's vision was unchanged and stable, during his conversation with Dr. Michaelson, Dr. Cangemi stated that Moustafa had developed new conditions, including cataracts. *Id.* Dr. Cangemi did not provide any medical documentation to support his changed conclusions. After it received Dr. Michaelson's report, Disability RMS requested an updated vocational opinion, which confirmed that gainful employment occupations existed, consistent with the restrictions contained in Dr. Michaelson's report and addendum. RS000208-11.

On April 9, 2014, ReliaStar denied Moustafa's appeal and upheld its determination that she was not entitled to benefits because she did not meet the "any gainful occupation" definition of disability. RS000195-98. To reach its conclusion, ReliaStar relied on Dr. Michaelson's report

---

[3] Dr. Michaelson's initial report noted that there was an inconsistency regarding Moustafa's best-corrected visual acuity in her left eye and that if 20/50 was her best corrected visual acuity, there should be an additional restriction regarding reading small fonts. RS000223. After speaking with Dr. Savoy's office and obtaining a missing page of Moustafa's medical records that addressed her best corrected visual acuity, Dr. Michaelson concluded that this restriction was unnecessary because 20/50 was her unaided visual acuity. Moustafa's best corrected visual acuity measured 20/25 at a distance and 20/30 at near. RS000202-03. Dr. Michaelson prepared an addendum to his report to confirm his conclusion that the additional small font restriction was unnecessary because Moustafa's corrected visual acuity was better than 20/50. RS000200-01.

7

and addendum as well as the updated vocational report. It also noted that Moustafa did not provide any medical documentation that would necessitate changing its prior determination that she could perform sedentary to light work. *Id.*

Moustafa submitted a second appeal on June 17, 2014, which included a new letter from Dr. Cangemi and four examination reports. RS000173. After discussing Moustafa's slow loss of visual acuity and the developing cataract in her left eye, Dr. Cangemi stated that it would be "extremely difficulty for [Moustafa] to perform at a full-time job requiring reading throughout the day and this is irrespective of the print or the font that she is using." RS000174-75. Dr. Cangemi opined that it is reasonable that Moustafa develops headaches and gets tired "as she is straining to see these areas and it is extremely difficult with one eye that has now more limited vision." *Id.* Dr. Michaelson reviewed this new material at ReliaStar's request, and in an addendum report, concluded that it did not change his opinion that Moustafa could work, subject to his previously stated restrictions. RS000125-26. As a result, on August 5, 2014, ReliaStar denied Moustafa's second appeal. RS000119-21.

Plaintiff filed her complaint in this matter on April 13, 2015, seeking to recover Plan benefits under ERISA, 29 U.S.C. § 1132(a)(1)(b). D.E. 1. Plaintiff subsequently filed this motion for summary judgment on March 4, 2016. D.E. 28. Plaintiff argues that ReliaStar's decision to terminate her long-term disability benefits was arbitrary and capricious. Plaintiff alleges that ReliaStar (1) improperly relied on a review of the paper documents rather than conducting an independent medical examination ("IME") or interviewing Moustafa; (2) "wantonly disregard[ed] Dr. Cangemi's reasoned assessment that [Moustafa] cannot work" and ignored other information submitted through her appeal; and (3) that ReliaStar's decision to terminate Moustafa's benefits is not supported by the administrative record. Plaintiff contends that the administrative record

"overwhelmingly support[s] a total disability status." *Id.* at 16-27. Finally, Plaintiff argues that she is statutorily entitled to an award of attorneys' fees and costs. *Id.* at 27-28.

ReliaStar opposed Plaintiff's motion and filed a cross-motion for summary judgment on March 25, 2016 (D.E. 30). ReliaStar argues that its decision to terminate Moustafa's disability benefits was not unreasonable. It contends that (1) Plaintiff failed to demonstrate why an IME would lead to a different conclusion than those reached by Dr. Cangemi and Dr. Savoy, whose opinions were both addressed in Dr. Michaelson's report; (2) there was a rational basis to rely on the information that it did, including Dr. Michaelson's report; and (3) the administrative record supports its decision to terminate Moustafa's benefits because she does not meet the "any gainful occupation" definition under the Plan. Def's Br. at 17-23. Consequently, ReliaStar argues that its decision to terminate Plaintiff's long-term disability benefits was not arbitrary or capricious. *Id.*

## II.    LEGAL STANDARDS

### A.    Summary Judgment Standard

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at

9

255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

The standard does not change when parties file cross-motions for summary judgment. When ruling on cross-motions, "the court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Morro v. DBMG Casino LLC*, 112 F. Supp. 3d 260, 276 (D.N.J. 2015) (internal citations omitted).

**B.     Standard of Review in an ERISA Denial of Benefits Claim**

The Court has jurisdiction over this ERISA matter pursuant to 29 U.S.C. § 1132(a)(1)(B). The Plan "provides ReliaStar with final discretionary authority to interpret the terms of the Plan and to determine eligibility for entitlement to Plan benefits in accordance with the terms of the Plan." PSOMF ¶ 6. Consequently, the parties agree that the decision to deny ERISA benefits is reviewed under an arbitrary and capricious standard. *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844 (3d Cir. 2011) ("We review a challenge by a participant to a termination of benefits under ERISA § 502(a)(1)(B) under an arbitrary and capricious standard where, as here, the plan grants the administrator discretionary authority to determine eligibility for benefits.").

The parties disagree, however, as to whether the decision to terminate Plaintiff's benefits was arbitrary and capricious. A decision is arbitrary and capricious "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 845 (quoting *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)). Substantial evidence exists when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012). Consequently, the Court's scope of review is narrow, and it "is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits." *Quinlan v. Reliance Standard Life Ins. Co.*, No. 13-7052, 2015 WL 519430, at *6 (D.N.J. Feb. 9, 2015). "Indeed, a decision may be disturbed only if it was unreasonable." *Aristone v. N.J. Carpenter's Pension Fund (Plan No. 001)*, No. 15-5709, 2016 WL 4265718, at *6 (D.N.J. Aug. 12, 2016). Moreover, "deference should be given to the lion's share of ERISA claims." *Dukes v. Liberty Life Assur. Co. of Bos.*, No. 14-806, 2015 WL 4132975, at *3 (D.N.J. July 7, 2015) (citation omitted).

When determining whether the decision to terminate benefits was arbitrary or capricious, a court must focus on the final, post-appeal decision. *Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 181

11

n. 11 (3d Cir. 2011), *abrogated on other grounds by Montanile v. Bd. of Trustees of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016). "While a court may consider pre-final decisions as evidence of the decision-making process that yielded the final decision, those decisions ought merely to inform a court's review of the final decision." *Id.* In addition, the Court is limited to evidence that was before the Plan Administrator at the time of the decision being reviewed." *Aristone*, 2016 WL 4265718, at *6.

Finally, in reviewing a denial of benefits claim, a court should consider both structural and procedural concerns. *Uqdah v. Unum Life Ins. Co. of Am.*, No. 14-6367, 2015 WL 5572678, at *6 (D.N.J. Sept. 21, 2015) (citing *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525-26 (3d Cir. 2009)). A structural inquiry "focuses on the financial incentives created by the way the plan is organized, i.e., whether there is a conflict of interest" and a procedural inquiry addresses "how the administrator treated the particular claimant." *Miller*, 632 F.3d at 845 (internal quotation marks omitted) (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 162 (3d Cir. 2007)).

## III. ANALYSIS

### A. Structural Conflict of Interest

There is a presumed structural conflict of interest where, as here, the insurance company both reviews claims and pays out benefits. *Estate of Schwing*, 562 F.3d at 526. "The existence of a conflict of interest, however, is not dispositive." *Uqday*, 2015 WL 5572678, at * 6 (quoting *Estate of Schwing*, 562 F.3d at 525-27). Instead, the fact that a conflict of interest exists is just one factor of many that a court must consider when determining whether the administrator was arbitrary or capricious. *Estate of Schwing*, 562 F.3d at 525-26 ("[B]enefits determinations arise in many different contexts and circumstances, and, therefore, the factors to be considered will be varied and case-specific."). Here, Plaintiff fails to point to any facts suggesting that the inherent

structural conflict had a direct impact on ReliaStar's decision to terminate her long-term disability benefits. Moreover, ReliaStar maintains that its third-party claims administrator, Disability RMS, made the final decision to terminate Moustafa's benefits. Def's Br. at 16; *see also Muccino v. Long Term Disability Plan for Choices Eligible Emps. of Johnson & Johnson*, No. 11-3641, 2012 WL 2119152, at *10 (D.N.J. June 11, 2012) (citing *Pinto v. Reliance Standard Life Ins.*, 214 F.3d 377, 383 (3d Cir. 2000) (stating that the "[a]dditional potential for structural conflict of interest is further mitigated when . . . the employer hires a third-party to administer the plan"). Consequently, "in the absence of evidence that bias infected the particular decision at issue, [the Court] defer[s] to an administrator's reasonable and carefully considered conclusions." *Post*, 501 F.3d at 164 (citation omitted).

## B. Procedural Conflict of Interest

A court must consider a variety of factors while conducting its procedural inquiry. The factors include: "(1) a reversal of a benefits determination without additional evidence; (2) a disregard of opinions previously relied upon; (3) a self-serving selectivity in the use of evidence or reliance on self-serving paper reviews of medical files; (4) a reliance on the opinions of non-treating physicians over treating physicians without explanation; (5) a reliance on inadequate information or incomplete investigation; (6) failure to comply with the notice requirements of Section 504 of ERISA; (7) failure to analyze all relevant diagnoses; and (8) failure to consider plaintiff's ability to perform actual job requirements." *Uqdah*, 2015 WL 5572678, at *6. Plaintiff argues that ReliaStar selectively considered the available medical evidence and failed to conduct a complete investigation. Therefore, Plaintiff argues that a number of these factors caused ReliaStar's arbitrary and capricious decision to terminate her long-term disability benefits.

### 1. Failure to Conduct an IME

13

Plaintiff alleges that ReliaStar improperly relied on paper records when it should have interviewed her or conducted an IME. Plf's Br. at 16-18. Plan administrators are not required to subject claimants to IMEs. *Molta v. Hewlett-Packard Emp. Benefits Org.*, No. 04-1705, 2006 WL 777005, at *10 (D.N.J. Mar. 24, 2006). Plan administrators often have discretionary authority to require an IME, which may be appropriate when "the claim involves subjective complaints." *Kelly v. Reliance Standard Life Ins. Co.*, No. 09-2478, 2011 WL 6756932, at *8 (D.N.J. Dec. 22, 2011). The failure to order an IME, however, is just one factor among many that a Court may consider when determining whether the decision to terminate benefits was arbitrary or capricious. *Reed v. Citigroup Inc.*, 2016 WL 3626816, --- F. App'x ---, at * 3 (3d Cir. 2016). In *Kelly v. Reliance Standard Life Insurance Company*, for example, the plan terminated the plaintiff's disability benefits after conducting a paper review of the medical records, which indicated that the plaintiff suffered from severe pain and functional difficulties after he was involved in an accident. The court determined that the plan's decision to terminate the plaintiff's benefits was arbitrary and capricious, in part, because of its failure to conduct an IME and due to its reliance on a paper review that discounted and ignored documented reports of pain. *Kelly*, 2011 WL 6756932, at *8; *but see Zurawel v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson*, No. 07-5973, 2010 WL 3862543, at *11 (D.N.J. Sept. 27, 2010) (failure to conduct an IME was not arbitrary or capricious because Plaintiff failed to establish that he was disabled).

The parties agree that ReliaStar had discretionary authority to subject Moustafa to an IME. Plf's Br. at 17; Def's Br. at 17-18. ReliaStar, however, did not require an IME, and instead largely relied on Dr. Michaelson's independent medical record review and his resulting report. RS000195-98; 119-21. ReliaStar's review was permissible under the Plan, and based on the facts at hand, was not arbitrary or capricious. Although Moustafa made subjective complaints of eye

14

fatigue, headaches, and dizziness (RS000248-50), these symptoms are not reflected in Dr. Cangemi or Dr. Savoy's medical records. In fact, Dr. Savoy's February 7, 2014 examination records state that Moustafa is not experiencing headaches, double vision, light flashes, floaters, or uncomfortable vision. RS000244. And while Dr. Cangemi's letters mention that it would not be unreasonable for Moustafa to get headaches or eye fatigue, and that she may have light sensitivity (RS000174-75; 240), these issues are not documented in his medical records. In addition, unlike *Kelly*, Dr. Michaelson's report does not discount or ignore the objective medical evidence in this case. Dr. Michaelson takes into account Moustafa's monocular status, visual field loss, and that her unaided visual acuity measured 20/50 and sets forth numerous restrictions on Moustafa's job abilities due to these documented medical condition. RS000125-26; 200-01; 224. Finally, Moustafa presented no evidence that she ever sought treatment for her eye fatigue, headaches, or dizziness.

### 2. Selective Consideration of Medical Evidence

Plaintiff also alleges that ReliaStar "wantonly disregarded Dr. Cangemi's reasoned assessment that [she] cannot work and instead rel[ied] on the cold review of its paper-reviewing employees." Plf's Br. at 18. In addition, Plaintiff contends that ReliaStar ignored her personal statement and Dr. Gumerman's vocational report. Plf's Br. at 18-19. ReliaStar responds that this argument is unsupported by the facts and law. Def's Br. at 19-23.

Plan administrators "need not give special deference to the opinions of treating physicians," but "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." *Kelly*, 2011 WL 6756932, at *5. Here, ReliaStar did not disregard Dr. Cangemi's assessment of Moustafa's ability to work. Moreover, Plaintiff's representation that Dr. Cangemi has "steadfastly supported" her inability to work is not accurate. In actuality, Dr.

15

Cangemi initially stated that Moustafa did not have any work restrictions (RS000326-27; 450-51), and ReliaStar explicitly relied on this information when it terminated Moustafa's benefits (RS000317).[4] Notably, Dr. Cangemi first opined that Moustafa was unable to work *after* ReliaStar terminated her benefits. Plaintiff similarly misconstrues Dr. Cangemi's reasoning as to why she cannot return to work. Dr. Cangemi stated that Moustafa "is at significant risk at all times that something could happen to her only seeing left eye." RS000241. Dr. Cangemi, however, failed to indicate what significant risk Moustafa faced. Plaintiff improperly extends this statement, arguing that Plaintiff is "at significant risk of injuring herself or, potentially, others if she were forced to return to work." Plf's Br. at 20. Dr. Cangemi did not provide such clarification.

Importantly, the administrative record demonstrates that ReliaStar considered Dr. Cangemi's changed opinion. Dr. Michaelson spoke with Dr. Cangemi by phone and sent Dr. Cangemi a letter confirming the substance of their conversation. Dr. Michaelson's letter set forth his opinion that Moustafa could return to work, subject to numerous restrictions[5] and gave Dr. Cangemi an opportunity to respond to the letter. RS000225-26. Dr. Cangemi did not do so. Although ReliaStar did not ultimately agree with Dr. Cangemi's assessment as to Moustafa's

---

[4] Plaintiff argues that ReliaStar places too much emphasis on Dr. Cangemi's "yes[,] light work" statement. Plaintiff posits that "given the context of the letter and the question posed, [] Dr. Cangemi was merely addressing Ms. Moustafa's physical capacity to perform light work" and that Dr. Cangemi thought he was answering a question about her ability to lift weights. Plf's Reply at 6. However, the relevant letter clearly asked about Moustafa's ability to return to work, not her capacity to lift weights. RS000326-27. Moreover, ReliaStar also specifically defined both light and sedentary work for Dr. Cangemi. *Id.* The Court finds that it was reasonable for ReliaStar to rely on Dr. Cangemi's initial assessment of Moustafa's restrictions.

[5] Plaintiff argues that "[t]here is no position in the workplace that would allow for these extreme limitations," and that Dr. Michaelson "essentially concluded that [she] cannot work." Plf's Reply at 4. Plaintiff, however, provides no facts to support her argument. ReliaStar's vocational consultant confirmed that gainful employment occupations existed given Moustafa's education, training and experience with the restrictions identified in Dr. Michaelson's report. RS000208-211. Plaintiff did not present evidence to refute this finding.

16

ability to work, it did not arbitrarily refuse to consider his opinion. *See* Uqdah, 2015 WL 5572678, at *6 (concluding that decision to terminate disability benefits was supported by objective and credible evidence despite fact that defendant rejected treating physician's opinion); *see also Azzanni v. MetLife Disability*, 700 F. Supp. 2d 1104, 1115 (E.D. Mo. 2010) (stating that decision to terminate benefits under "any gainful occupation" definition was reasonable where experts disagreed with treating physician's conclusion that plaintiff was disabled due to his diabetes and diabetic retinopathy).

Similarly, ReliaStar appropriately considered Moustafa's personal statement and Dr. Gumerman's vocational report. Again, Moustafa's subjective complaints of eye fatigue, headaches, and dizziness, which were adopted by Dr. Gumerman, are not supported by the medical records. She submitted no evidence indicating that she ever sought treatment for such ailments, and the records reflect that Moustafa made contrary assertions to Dr. Savoy in February 2014. Further, Dr. Gumerman's report addressed additional limitations such as Moustafa's capacity to concentrate and her musculoskeletal problems. RS000258. These problems are also not documented in the administrative record. Due to the lack of supporting medical evidence, it was not arbitrary or capricious for ReliaStar to fail to give substantial weight to this evidence.

### 3. Support for ReliaStar's Decision to Terminate Benefits

Finally, Plaintiff alleges that the evidence "overwhelmingly support[s] a total disability status." Plf's Br. at 24-26. In response, ReliaStar contends that its decision to terminate Moustafa's benefits is supported by substantial evidence in the administrative record. Def's Br. at 23.

The Court concludes there is substantial evidence in the administrative record to support ReliaStar's determination that Moustafa did not meet the "any gainful occupation" definition of

17

disability. As discussed above, Dr. Cangemi initially stated that Plaintiff could return to work with no restrictions. RS000326-27; 450-51. After ReliaStar terminated Moustafa's benefits, Dr. Cangemi changed his opinion, concluding that Moustafa could not return to full-time employment. RS000240-42. Importantly, Dr. Cangemi does not provide medical documentation to support his changed opinion. Rather, Dr. Cangemi told Dr. Michaelson that his opinion is based on Dr. Savoy's February 7, 2014 examination. RS000225-26. While the February 7 examination report notes that Moustafa is developing a cataract, it also indicates that her condition is stable and that she did not have physical ocular symptoms, headaches, visual floaters, light flashes or blurry vision. RS000244-46. Moreover, as of July 10, 2014, Dr. Cangemi confirmed that Moustafa's unaided visual acuity, as measured by Dr. Savoy, was 20/50. RS000129. The corrected visual acuity in her left eye consistently measured between 20/25 and 20/30. RS000126.

Using this information, Dr. Michaelson, ReliaStar's independent medical reviewer, concluded that Moustafa could return to work. As discussed, however, Dr. Michaelson found that Moustafa was subject to multiple restrictions due to her "monocular status and visual field loss." RS000224. ReliaStar's vocational analysis identified fourteen occupations that were available to Moustafa, given Dr. Michaelson's restrictions, that constituted a gainful occupation under the plan. RS000316-20.

Plaintiff relies heavily on *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381 (3d Cir. 2003) to support her argument that the medical records demonstrate she was unable to return to work because she faced significant risk of injury. Plf's Br. at 20. Plaintiff states that "[t]he *Lasser* Court emphasized that an insured is considered disabled when the individual is unable to work without endangering his or her health or risk his or her life." *Id.* at 21. However, the plan in *Lasser* concerned the first category, "regular occupation," *id.* at 385, pursuant to which Moustafa did

18

receive thirty-six months of disability payments. Here, Plaintiff is disabled under the Plan only if she is unable to "perform the essential duties of any gainful occupation[,]" the second category. RS000494. Consequently, *Lasser* is distinguishable. *See Brandeburg v. Corning Inc. Pension Plan for Hourly Emps.*, 243 F. App'x 671, 673 (3d Cir. 2007) (distinguishing *Lasser* because "it involved an occupational disability policy as opposed to a general disability policy"). As discussed, ReliaStar identified numerous available occupations, even in light of the restrictions Dr. Michaelson identified.

### 4. The Remaining Factors

Moustafa does not address the following factors: (1) the reversal of a benefits determination without additional evidence; (2) a disregard of opinions previously relied upon; (6) failure to comply with the notice requirements of Section 504 of ERISA; and (7) failure to analyze all relevant diagnoses. In its analysis, the Court found these factors to favor ReliaStar: it did not reverse its current benefits determination, it did seek additional evidence, it did not disregard opinions that it previously relied upon, it apparently complied with the notice requirements, and it analyzed all diagnoses.

In conclusion, neither the structural nor the procedural factors demonstrate that ReliaStar's decision to terminate Plaintiff's long-term disability benefits was arbitrary or capricious. Instead, the facts demonstrate that ReliaStar conducted a full and fair review before concluding that Moustafa did not satisfy the "any gainful occupation" definition of disability. Moreover, ReliaStar's decision is supported by objective and credible evidence. Consequently, there are no material issues of fact in dispute and Defendant has demonstrated that it is entitled to judgment as a matter of law. Plaintiff's motion for summary judgment is denied and Defendant's cross-motion for summary judgment is granted.

### 5. Attorneys' Fees

Plaintiff contends that pursuant to Section 1132(g)(1), she is entitled to recover reasonable attorneys' fee and costs in this action. Plf's Br. at 27-28. "Pursuant to that statute, the defendant in an ERISA action usually bears the burden of attorney's fees for the prevailing plaintiff." *Brytus v. Spang & Co.*, 203 F.3d 238, 242 (3d Cir. 2000). Because Plaintiff is not the prevailing party here, she is not entitled to an award of attorneys' fees or costs.

## IV. CONCLUSION

For the foregoing reasons and for good cause shown, Plaintiff's Motion for Summary Judgment (D.E. 28) is **DENIED** and Defendant's Cross-Motion for Summary Judgment (D.E. 30) is **GRANTED**. An appropriate form of order accompanies this opinion.

Dated: November 8, 2016

John Michael Vazquez, U.S.D.J.